UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

BRIDGEWATER ASSOCIATES, INC.,

                              Plaintiff,

        -against-

VIVIN OBEROI and TELLURIDE ASSET MANAGEMENT
LLC,

                              Defendants.

CIVIL ACTION NO.

JANUARY 16, 2004

**MEMORANDUM OF LAW IN SUPPORT OF
PLAINTIFF'S APPLICATION FOR A TEMPORARY
RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

Jonathan B. Tropp (ct11295)
Day, Berry & Howard LLP
One Canterbury Green
Stamford, Connecticut 06901
(203) 977-7300
Fax: (203) 977-7301

Attorneys for Plaintiff
Bridgewater Associates, Inc.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES.................................................................................... iii

PRELIMINARY STATEMENT ........................................................................... 1

FACTS ................................................................................................................. 2

ARGUMENT ....................................................................................................... 2

POINT I      THE REQUESTED INJUNCTIVE RELIEF SHOULD BE GRANTED
BECAUSE OF DEFENDANTS' CONTINUING VIOLATIONS OF THE
CONNECTICUT TRADE .......................................................................... 2

    A.     Applicable Standard for Injunctive Relief ................................. 2

        1.     The Connecticut Uniform Trade Secrets Act ................... 2

        2.     The Connecticut Unfair Trade Practices Act................... 3

    B.     Preliminary Injunctive Relief Under CUTSA Is Necessary to Preserve the
Security of Bridgewater's Trade Secrets ..................................... 4

        1.     Bridgewater's Investment Management Systems Are Trade Secrets    4

            a.     The Investment Management Systems Afford Bridgewater
a Competitive Advantage.................................... 5

            b.     Bridgewater Zealously Guards the Secrecy of Its
Investment Management Systems ....................... 5

        2.     Oberoi And Telluride Have Misappropriated Bridgewater's Trade
Secrets and Will Continue to Do So Unless Enjoined ..................... 7

    C.     Preliminary Injunctive Relief Is Necessary to Prevent Further Violations
of CUTPA ................................................................................... 10

POINT II    PRELIMINARY INJUNCTIVE RELIEF SHOULD BE GRANTED TO
PREVENT THE IRREPARABLE INJURY THAT WILL OTHERWISE
RESULT FROM OBEROI'S CONTINUING BREACH OF HIS NON-
COMPETE AND CONFIDENTIALITY OBLIGATIONS......................... 12

    A.     Applicable Standard for Injunctive Relief ................................. 12

    B.     Bridgewater Will Suffer Irreparable Injury If Injunctive Relief Is Not
Granted........................................................................................ 13

C.      Bridgewater Has Shown a Likelihood of Success on the Merits of Its Claim for Breach of Oberoi's Agreement Not To Compete ........................ 14

D.      Bridgewater Has Shown a Likelihood of Success on the Merits of Its Claim For Breach of Oberoi's Confidentiality Agreement ................. 18

E.      The Balance of the Equities Favors Granting the Injunctive Relief ............. 18

CONCLUSION ........................................................................................................... 20

## TABLE OF AUTHORITIES

**Page(s)**

CASES

Allen Manufacturing Co. v. Loika,
145 Conn. 509, 144 A.2d 306 (1958) .......................................................... 11, 18, 19

Associated Investment Co. v. Williams Associates IV.,
230 Conn. 148, 645 A.2d 505 (1994) ........................................................ 10

Avery Dennison Corp. v. Finkle,
No. CV010757706, 2002 WL 241284
(Conn. Super. Ct. Feb. 1, 2002) ...................................................... 2-3, 6, 8

Branson Ultrasonics Corp. v. Stratman,
921 F. Supp. 909 (D. Conn. 1996) .................................................... passim

Business Intelligence Services, Inc. v. Hudson,
580 F. Supp. 1068 (S.D.N.Y. 1984) ........................................................ 16

Continental Group, Inc. v. Kinsley,
422 F. Supp. 838 (1976) ............................................................ 19

Daddona v. Liberty Mobile Home Sales,
209 Conn. 243, 550 A.2d 1061 (1988) ...................................................... 10

Dunsmore & Associates, Ltd. v. D'Alessio,
No. 409906, 2000 WL 124995 (Conn. Super. Ct. Jan. 6, 2000) ......................... 11, 12

Gillette Co. v. Williams,
360 F. Supp. 1171 (D. Conn. 1973) ....................................................... 14-15

Industrial Technologies, Inc. v. Paumi,
No. CV 960335925, 1997 WL 306723
(Conn. Super. Ct. May 28, 1997) ............................................................ 16

Jacobson & Co. v. Armstrong Cork Co.,
548 F.2d 438 (2d Cir. 1977) .............................................................. 13

Jacques All Traders Corp. v. Brown,
57 Conn. App. 189, 752 A.2d 1098 (2000) .............................................. 3

Jayaraj v. Scappini
66 F.3d 36 (2d Cir. 1995) ............................................................... 12

KX Industries, L.P. v. Saaski,
  No. CV 960386806S, 1997 WL 583629
  (Conn. Super. Ct. Aug. 29, 1997)............................................................ 16, 17, 18-19

Link Group International v. Toymax, Inc.,
  No. 3-97-CV -670 (JCH), 2000 U.S. Dist. LEXIS 45671
  (D. Conn. March 17, 2000)........................................................................................ 11

LCD Lighting, Inc. v. Voltarc, Inc.,
  No. CV020462839, 2003 WL 1848051
  (Conn. Super. Ct. March 24, 2003) ........................................................................ 3, 6

Loveridge v. Pendleton Woolen Mills, Inc.,
  788 F.2d 914 (2d Cir. 1986)...................................................................................... 12

May v. Young,
  125 Conn. 1, 2 A.2d 385 (1938)................................................................................ 16

Mec-Gar, S.R.L. v. Hard,
  No. CV020077396S, 2002 WL. 31440778
  (Conn. Super. Ct. Oct. 2, 2002).............................................................................. 2, 13

Minnesota Mining & Manufacturing, Co. v. Francavilla,
  191 F. Supp. 2d 270 (D. Conn. 2002)................................................................. passim

Muniz v. Kravis,
  59 Conn. App. 704, 757 A.2d 1207 (2000) ........................................................ 10, 12

New Haven Tobacco Co. v. Perelli,
  18 Conn. App. 531, 536, 559 A.2d 715, 718 (1989)................................................. 17

Newinno, Inc. v. Peregrim Development, Inc.,
  No. CV 0203900745, 2003 WL 21493838 (Conn. Super. Ct. June 3, 2003)............. 16

Robert S. Weiss & Associates, Inc. v. Wiederlight,
  208 Conn. 525, 546 A.2d 216 (1988)......................................................... 4-5, 14, 16

Scott v. General Iron & Welding Co.,
  71 Conn. 132, 368 A.2d 111 (1976).................................................................... 14, 15

Tillquist v. Ford Motor Credit Co.,
  714 F. Supp. 607 (D. Conn. 1989) ........................................................................... 11

Tom Doherty Associates v. Saban Entertainment,
60 F.3d 27 (2d Cir. 1995) .......................................................................... 13

Torrington Creamery, Inc. v. Davenport,
126 Conn. 515, 12 A.2d 780 (1940) .......................................................... 15

Town & Country House & Home Serv., Inc. v. Evans,
150 Conn. 314, 189 A.2d 390 (1963) .................................................. 5-6, 18

Weseley Software Development Corp. v. Burdette,
977 F. Supp. 137 (D. Conn. 1997) ..................................................... 7, 8, 18

**STATUTES**

Fed. R. Civ. P. 65 ............................................................................... 3, 12

Conn. Gen. Stat. § 35-51(b) ...................................................................... 4

Conn. Gen. Stat. § 35-51(c) ...................................................................... 4

Conn. Gen. Stat. § 35-51(d) ................................................................... 4-5, 8

Conn. Gen. Stat. § 35-52 (a) ..................................................................... 2

Conn. Gen. Stat. § 35-57(a) .................................................................... 11

Conn. Gen. Stat. § 42-110b(a) ............................................................. 3, 10

Conn. Gen. Stat. § 42-110g(a) ................................................................. 3

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

BRIDGEWATER ASSOCIATES, INC.,

                         Plaintiff,

-against-

VIVIN OBEROI and TELLURIDE ASSET MANAGEMENT
LLC,

                       Defendants.

CIVIL ACTION NO.

JANUARY 16, 2004

## MEMORANDUM OF LAW IN SUPPORT OF
## PLAINTIFF'S APPLICATION FOR A TEMPORARY
## RESTRAINING ORDER AND PRELIMINARY INJUNCTION

### PRELIMINARY STATEMENT

Plaintiff Bridgewater Associates, Inc. ("Bridgewater") submits this Memorandum of Law in support of its application, pursuant to Conn. Gen. Stat. § 35-52, Conn. Gen. Stat. § 42-110g and Fed. R. Civ. P. 65, for a temporary restraining order and preliminary injunction enjoining (i) defendants Vivin Oberoi ("Oberoi") and Telluride Asset Management LLC ("Telluride") from in any way using or disclosing to anyone, any trade secrets and other confidential proprietary information of Bridgewater, including any information concerning Bridgewater's Investment Management Systems, as that term is defined in paragraph 10 of the Complaint; (ii) Oberoi from working for or in any manner taking part in the business of Telluride or any other business which is in direct competition with Bridgewater; and (iii) Telluride from employing Oberoi in any capacity.

## FACTS

The facts are fully set forth in the accompanying affidavits of Raymond Dalio, sworn to on January 15, 2004 ("Dalio Aff."), and Joseph Quinn, sworn to on January 16, 2004 ("Quinn Aff."), and in plaintiff's Complaint.

## ARGUMENT

## POINT I

## THE REQUESTED INJUNCTIVE RELIEF SHOULD BE GRANTED BECAUSE OF DEFENDANTS' CONTINUING VIOLATIONS OF THE CONNECTICUT TRADE SECRETS ACT AND THE CONNECTICUT UNFAIR TRADE PRACTICES ACT

### A.     Applicable Standard for Injunctive Relief

####     1.     The Connecticut Uniform Trade Secrets Act

Plaintiff's First and Second Claims for Relief seek a preliminary injunction based on defendants' continuing violations of the Connecticut Uniform Trade Secrets Act, § 35-50 et seq. ("CUTSA").   CUTSA provides that "[a]ctual or threatened misappropriation [of trade secrets] may be enjoined upon application to any court of competent jurisdiction."  Conn. Gen. Stat. § 35-52(a).

The standard for granting preliminary injunctive relief under CUTSA is significantly less stringent than the standard that would otherwise apply under Fed. R. Civ. P. 65. Where the loss of trade secrets is at stake, a showing of irreparable injury is presumed.  Mec-Gar, S.R.L. v. Hard, No. CV020077396S, 2002 WL 31440778, at *7 (Conn. Super. Ct. Oct. 2, 2002) (noting that "[a] trade secret once lost is, of course, lost forever") (citation omitted).[1]  A party seeking an injunction to preserve the security of trade secrets is not required to allege and prove "the absence of an adequate remedy at law."    Avery Dennison Corp. v. Finkle, No.

---

[1]      All unpublished opinions cited in this Memorandum of Law are included in alphabetical order in the accompanying Compendium of Unpublished Opinions.

CV010757706, 2002 WL 241284, at *3, n. 12 (Conn. Super. Ct. Feb. 1, 2002) ("the finding by the court of actual or threatened misappropriation of trade secrets pursuant to statute, should be grounds for granting the relief requested under the statute."); see also LCD Lighting, Inc., v. Voltarc, Inc., No. CV020462839, 2003 WL 1848051, at * 12 (Conn. Super. Ct. March 24, 2003) ("enactment of the statute by implication assumes that no adequate alternative remedy exists and that injury was irreparable . . .") (citation omitted). Thus, the moving party need only establish: (1) the existence of a trade secret; and (2) actual or threatened misappropriation of that trade secret.

### 2. The Connecticut Unfair Trade Practices Act

Plaintiff's Third and Fourth Claims for Relief seek a preliminary injunction under the Connecticut Unfair Trade Practices Act, § 42-110 et seq. ("CUTPA"). CUTPA grants the court discretion to award injunctive relief to "[a]ny person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment of a method, act or practice prohibited by section 42-110b . . . ." Conn. Gen. St. § 42-110g(a). Section 42-110b(a) provides that "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."

As with CUTSA, the standard for granting a preliminary injunction under CUTPA is far less rigorous than under Fed. R. Civ. P. 65. The plaintiff need show only that it has (1) suffered ascertainable loss and (2) that the loss was a consequence of defendant's unfair methods of competition or unfair deceptive acts or practices. See Jacques All Traders Corp. v. Brown, 57 Conn. App. 189, 197, 752 A.2d 1098, 1103 (2000) ("if a court determines that a practice is unfair or deceptive [under CUTPA], it may, in its discretion, order . . . injunctive . . . relief").

**B. Preliminary Injunctive Relief Under
CUTSA Is Necessary to Preserve
the Security of Bridgewater's Trade Secrets**

Section 35-51(b) of CUTSA defines "misappropriation" as:

(1) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or (2) disclosure or use of a trade secret of another without express or implied consent by a person who (A) used improper means to acquire knowledge of the trade secret; or (B) at the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was (i) derived from or through a person who had utilized improper means to acquire it; (ii) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use. . . ; or (iii) derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use . . . .[2]

Conn. Gen. Stat. § 35-51(b). Here, as described below, Bridgewater's Investment Management Systems constitute "trade secrets," and defendants have misappropriated those trade secrets and will continue to do so unless preliminarily enjoined.

**1. Bridgewater's Investment Management Systems Are Trade Secrets**

Under CUTSA, "trade secret" means

information, including a formula, pattern, compilation, program, device, method, technique, process, drawing, . . . that: (1) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Conn. Gen. Stat. § 35-51(d); see also Robert S. Weiss & Assocs., Inc. v. Wiederlight, 208 Conn. 525, 538, 546 A.2d 216, 223-24 (1988) (defining "trade secret" as a "formula, pattern, device or

---

[2] "Person" is defined as a "natural person, corporation, limited liability company, business trust, estate, trust, partnership, association, joint venture, government, governmental subdivision or agency, or any other legal or commercial entity." Conn. Gen. Stat. § 35-51(c).

compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it") (citations omitted).

### a. The Investment Management Systems Afford Bridgewater a Competitive Advantage

Vigorous competition exists in the investment management business. Dalio Aff. ¶ 36. Bridgewater's Investment Management Systems are erected on a foundation of unique insights that Bridgewater has gained over the last 28 years. Dalio Aff. ¶ 8. Bridgewater has spent many years and millions of dollars creating the Investment Management Systems, and those Systems are impossible to duplicate by competitors unwilling to devote comparable time and expense to the necessary research effort. Dalio Aff. ¶ 12. Moreover, even if competitors were to make the required effort, there is no guarantee that they would ever achieve the insights necessary to make the effort a success.

It is also easily shown that Bridgewater's Investment Management Systems form the basis of Bridgewater's success in the investment management business. Dalio Aff. ¶ 36. Year after year, Bridgewater's strict application of its Investment Management Systems has resulted in rates of return that substantially exceed the industry average. Based on those results, Bridgewater has been able to attract and retain clients, resulting in impressive growth.

### b. Bridgewater Zealously Guards the Secrecy of Its Investment Management Systems

In determining whether an employer has made reasonable efforts to maintain the secrecy of the information at issue, the courts look to the following factors: "(1) the extent to which the information is known outside the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of the measures taken by the employer to guard the secrecy of the information; (4) the value of the information to the

employer and his competitors; (5) the amount of effort or money expended by the employer in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others." Town & Country House & Home Serv., Inc. v. Evans, 150 Conn. 314, 319, 189 A.2d 390, 393 (1963) (citation omitted); see also Avery Dennison Corp., No. CV010757706, 2002 WL 241284, at *3 (Conn. Super. Ct. Feb. 1, 2002) (an employer's requirement that employees (1) sign non-compete covenants, (2) keep logs of the products they work on, and (3) sign a "check-out form" when they leave employment proves a reasonable effort at security); LCD Lighting, Inc. v. Voltarc, Inc., No. CV020462839, 2003 WL 184805, at *7 (Conn. Super. Ct. March 24, 2003) (an employer who restricted access to manufacturing plant and specifications made reasonable efforts to protect security). However, it is not necessary that only one person in a company have exclusive possession of special information for that information to constitute a trade secret. Rather, it need only be shown that "a substantial element of secrecy . . . exist[s]." Town & Country House & Home Serv, 150 Conn. at 319, 189 A.2d at 393.

Here, Bridgewater has zealously guarded the confidentiality of its Investment Management Systems. For example, in its 28 years of existence, Bridgewater has allowed only seven employees, out of a current workforce of 150, to access the computer server that houses its Investment Management Systems. Furthermore, that computer server is protected by multiple layers of security that includes specific passwords, specific user access control and auditing. Dalio Aff. ¶ 13. Oberoi was one of the seven select employees who garnered enough trust to obtain access to Bridgewater's trade secrets, and is the only one of those seven employees who has ever left the employ of Bridgewater. Dalio Aff. ¶ 33.

As a further precaution to maintain the secrecy of its Investment Management Systems, Bridgewater has required all employees, including Oberoi, to sign agreements containing confidentiality covenants and covenants not to compete. See Weseley Software Dev. Corp. v. Burdette, 977 F. Supp 137, 146 (D. Conn. 1997).

All the other factors to be examined by the court support a finding of "trade secrets" protection here. The Investment Management Systems' value is confirmed by its success in consistently yielding returns that exceed the industry average. Those returns have garnered Bridgewater repeated "top ten" rankings in a leading trade journal. Dalio Aff. ¶ 38.

In addition, Bridgewater's Investment Management Systems were not created overnight, but represent the culmination of many years of effort made by several "closeted" Bridgewater employees working under the guidance of Raymond Dalio, Bridgewater's founder, President and Chief Investment Officer. Dalio Aff. ¶ 8. It also would be extremely difficult for anyone else to recreate Bridgewater's Investment Management Systems. Indeed, even if a competitor were willing to devote the required time and to incur the millions of dollars in costs associated with such an effort, there would be no guarantee of success -- Bridgewater's unique insights might well never be obtained. Dalio Aff. ¶ 12. In sum, Bridgewater has amply demonstrated that its Investment Management Systems are trade secrets.

**2.     Oberoi And Telluride Have Misappropriated Bridgewater's Trade Secrets and Will Continue to Do So Unless Enjoined**

In September 2003, Oberoi resigned from his employment with Bridgewater. At that time, he was evasive in describing his future professional plans to his colleagues, stating only that he planned to attend to some family matters in India. Less than two months later, unbeknownst to Bridgewater, Telluride hired Oberoi as a Portfolio Manager. Dalio Aff. ¶¶ 24, 25.

Telluride is a start-up hedge fund that, like Bridgewater, applies a global macro fundamental approach in making investment decisions. Thus, it is a direct competitor of Bridgewater. Dalio Aff. ¶ 26. Moreover, Oberoi, as a Portfolio Manager at Telluride, will be making investment decisions based upon the effects of macro-economic conditions, such as interest rates and currency exchange rates, on investment instruments such as sovereign debt, currencies and related derivatives. Dalio Aff. ¶ 28. Oberoi's only training and experience in this approach to investment management comes from his confidential work concerning Bridgewater's Investment Management Systems. Thus, in his new position at Telluride, Oberoi will necessarily use, and thus misappropriate, Bridgewater's trade secrets. Indeed, he presumably has already done so.

Even if Oberoi and Telluride had the best of intentions (and Oberoi's concealment of his new job from Bridgewater shows that he does not), it is well-established that a preliminary injunction should issue to prevent an actual or threatened disclosure of trade secrets. See §§ 35-51(d), 35-52; Weseley Software Dev. Corp., 977 F. Supp. at 147 (violation found when harm to the employer could not be avoided even by an employee's "scrupulous efforts to avoid disclosure") (citation omitted); Avery Dennison Corp., 2002 WL 241284, at *2 n. 6 (invoking the inevitable disclosure doctrine and noting that Connecticut law forbids both "[a]ctual and threatened misappropriation") (citation omitted).

The district court's ruling in Branson Ultrasonics Corp. v. Stratman, 921 F. Supp. 909 (D. Conn. 1996), is particularly instructive here. In Branson, the defendant, Stratman, had been employed as an engineer by the plaintiff, Branson Ultrasonic Corp. ("Branson"). Branson engineered products that used high energy vibration to produce heat and create welds to join plastics and other materials. Branson hired Stratman to develop computerized controls for a new

line of joining equipment known as the 1000 series.  Branson's offer of employment letter emphasized that Stratman would be working with trade secrets and highly confidential information and that release of that information to competitors would cause irreparable injury to Branson.  In addition, Stratman was required to sign a confidentiality agreement.

After two years, Stratman left Branson to work for a competitor, Dukane.  At Dukane, Stratman was not involved with plastics, but instead was responsible for developing Dukane's metal welding products.  The court, however, found that "[t]he Dukane equipment . . . in metal welding is substantially similar to the [Branson] equipment that is used to join plastics."  Id. at 912.  The court accordingly enjoined Stratman from working at Dukane even though Stratman was instructed by his supervisor not to have any direct contact with Dukane's engineers.  In issuing its injunction, the court recognized that:

> In the course of his new employment at Dukane, opportunities will arise for Stratman to use and disclose confidential information he gained while at Branson.  His familiarity with the controls of the 1000 series will enable him to evaluate and compare the relative strengths and weaknesses of the controls made by Dukane . . . [additionally, Branson would have] opportunities to use and disclose Branson's trade secrets and confidential information.  Stratman's use and disclosure of this information might well be unintentional. Nevertheless, it is likely, if not inevitable, that such use and disclosure will occur.

Id. at 912-13.

Here, like the situation in Branson, Bridgewater informed Oberoi before his first day of work that:

> You will be dealing with proprietary information that is confidential.  We will ask you to sign an employee confidentiality agreement on your first day of employment.  This is to protect Bridgewater and its clients, but also is important for you so that you understand the importance of the information that you will be working with.

Dalio Aff. Ex. A. Consistent with that letter, upon his arrival at Bridgewater Oberoi signed a confidentiality agreement, in which he agreed not to disclose or communicate any matters concerning Bridgewater's business, including the use of economic statistics in investment decision-making and the use of fundamental data in investment decision-making rules. Dalio Aff. Ex. B. On October 6, 1998, Oberoi signed a new and superseding confidentiality agreement (the "Agreement") that contained identical language, as well as a non-compete restriction. Dalio Aff. Ex. C. Furthermore, throughout Oberoi's employment at Bridgewater, Oberoi and Dalio had numerous conversations concerning the need to maintain the secrecy of the Investment Management Systems, in which Oberoi repeatedly assured Dalio that he would maintain the information in the strictest confidence and confirmed his understanding that he would be precluded from working for competitors. Dalio Aff. ¶ 22.

Even more so than in Branson, it is inevitable that Oberoi will divulge and use Bridgewater's trade secrets concerning the Investment Management Systems in managing funds for customers of Telluride. An injunction is required here, as in Branson, to prevent that result.

## C.     Preliminary Injunctive Relief Is Necessary to Prevent Further Violations of CUTPA

CUTPA states that "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. St. § 42-110b(a). A practice violates CUTPA if it "offends public policy or comes within some established concept of unfairness, . . . is immoral, unethical, oppressive or unscrupulous or . . . causes substantial injury to consumers, competitors or other businessmen." Muniz v. Kravis, 59 Conn. App. 704, 713, 757 A.2d 1207, 1213-14 (2000) (citing Associated Inv. Co. v. Williams Assocs. IV., 230 Conn. 148, 155, 645 A.2d 505, 509 (1994); Daddona v. Liberty Mobile Home Sales, 209 Conn. 243, 254, 550 A.2d 1061, 1066 (1988)). Significantly, CUTPA is understood

to embrace a broader standard of conduct and to be more flexible than traditional common law tort claims, since it does not require proof of intent to deceive, mislead or defraud. Id.

Here, defendants, by usurping Bridgewater's trade secrets and confidential information and using them to compete against Bridgewater in the money management business, have violated CUTPA. First, defendants' conduct certainly offends Connecticut's public policy of protecting a company's interest in the trade secrets and proprietary information it has developed through its own efforts. Second, the defendants' use of Bridgewater's trade secrets, without purchasing the right to use those trade secrets or otherwise obtaining Bridgewater's permission, violates the established concepts of fairness reflected in CUTSA and in the common law doctrines of conversion and an employee's implied duty to maintain the confidentiality of his or her employer's trade secrets. See Allen Mfg. Co. v. Loika, 145 Conn. 949, 144 A.2d 306 (1958).[3] Furthermore, a statutory violation of CUTSA standing alone, is sufficient to establish a CUPTA violation. Link Group Int'l v. Toymax, Inc., No. 3-97-CV-670 (JCH), 2000 U.S. Dist. LEXIS 4567, at *61 (D. Conn. Mar. 17, 2000) (observing that a CUTSA violation may form the basis of a finding of a public policy violation under CUTPA); Tillquist v. Ford Motor Credit Co., 714 F. Supp. 607, 616-17 (D. Conn. 1989) (concluding that a violation of regulations caused a violation of public policy and therefore, of CUTPA).

Finally, defendants' acquisition of Bridgewater's trade secrets by surreptitiously entering into an employment arrangement without Bridgewater's knowledge, and with the knowledge that Oberoi would necessarily use Bridgewater's trade secrets and confidential and

---

[3]    Section 35-57 of CUTSA provides that the Act "supercede[s] any conflicting tort, restitutionary, or other law of this state pertaining to civil liability for misappropriation of a trade secret." Conn. Gen. Stat. § 35-57(a). Nevertheless, the courts have invoked the common law trade secret cases in defining unfair practices of employees that violate CUTPA. See Dunsmore & Assocs., Ltd. v. D'Alessio, No. 409906, 2000 WL 124995, at *13 (Conn. Super. Ct. Jan. 6, 2000).

proprietary information for the benefit of Telluride, is not only "unethical" and "unscrupulous" but, as described in Point I.B.2. above, will cause substantial injury to Telluride's competitor – Bridgewater.  See Muniz, 59 Conn. App. at 713, 757 A.2d at 1213-14; Dunsmore & Assocs., Ltd. v. D'Alessio, No. 409906, 2000 WL 124995, at *13 (Conn. Super. Ct. Jan. 6, 2000) (taking trade secrets and using them for a competitive advantage is an unfair practice and constitutes unfair competition).  Defendants should therefore also be enjoined under CUTPA from continuing their unfair practice of usurping Bridgewater's trade secrets and confidential and proprietary information.

## POINT II

**PRELIMINARY INJUNCTIVE RELIEF SHOULD BE GRANTED
TO PREVENT THE IRREPARABLE INJURY THAT WILL
OTHERWISE RESULT FROM OBEROI'S CONTINUING BREACH
OF HIS NON-COMPETE AND CONFIDENTIALITY OBLIGATIONS**

**A.**     **Applicable Standard for Injunctive Relief**

In addition to injunctive relief based on defendants' violations of CUTSA and CUTPA, Bridgewater seeks a preliminary injunction to restrain Oberoi's continuing violation of the non-compete and confidentiality obligations set forth in Oberoi's October 6, 1998 Agreement with Bridgewater.  See Complaint, Fifth Claim for Relief.  As to these breach of contract claims, Fed. R. Civ. P. 65 applies and Bridgewater must therefore establish: (1) irreparable injury absent the granting of a preliminary injunction; (2) either "(a) likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them fair grounds for litigation" and (3) a balance of the equities decidedly in Bridgewater's favor.  See Jayaraj v. Scappini, 66 F.3d 36, 38 (2d Cir. 1995) (citing Loveridge v. Pendleton Woolen Mills, Inc., 788 F.2d 914, 916 (2d Cir. 1986)).

**B.  Bridgewater Will Suffer Irreparable
Injury If Injunctive Relief Is Not Granted**

"Perhaps the single most important prerequisite for the issuance of a preliminary injunction is a demonstration that if it is not granted the applicant is likely to suffer irreparable harm before a decision on the merits can be rendered." Minnesota Mining & Mfg., Co. v. Francavilla, 191 F. Supp. 2d 270, 277 (D. Conn. 2002) (citations omitted).  Here, as described in Point I.B.2. above, Bridgewater faces the loss of the valuable trade secrets upon which its entire business, which has taken 28 years to build, is based.  The courts have repeatedly recognized that where a loss of trade secrets is threatened, the irreparable injury requirement is met.  See, e.g., Mec-Gar, S.R.L. v. Hard, No. CV 020077396S, 2002 WL 31440778, at * 7 (Conn. Super. Ct. Oct. 2, 2002).

The irreparable injury requirement is also met when "a monetary award cannot be adequate compensation." Tom Doherty Assocs. v. Saban Entertainment, 60 F.3d 27, 37 (2d Cir. 1995) (citation omitted).  The Second Circuit recognizes that "a threatened loss of goodwill and customers, both present and potential, [cannot] be rectified by monetary damages" and thus warrants injunctive relief.  Jacobson & Co. v. Armstrong Cork Co., 548 F.2d 438, 445 (2d Cir. 1977); see also Tom Doherty Assocs., 60 F.3d at 37 (cataloging Second Circuit cases awarding injunctive relief for loss of goodwill).  Here, Telluride has already solicited at least one of Bridgewater's customers, promoting Oberoi as a former Bridgewater employee who will be providing macro-strategy analysis for the funds that Telluride manages.  Unless this Court preliminarily enjoins Oberoi from violating his contractual obligations, Bridgewater is clearly threatened with a loss of customers and the dilution of the goodwill attributable to its exclusive use of the proprietary Investment Management Systems it created.  For this additional reason, Bridgewater has satisfied the irreparable injury requirement.

**C.    Bridgewater Has Shown a Likelihood of
        Success on the Merits of Its Claim for
        Breach of Oberoi's Agreement Not To Compete**

In Section 3 of the October 6, 1998 Agreement (Dalio Aff. Ex. C.), Oberoi agreed that:

> For a period of two (2) years after the termination of the Employee's employment, irrespective of the reasons for such termination, the Employee shall not, directly or indirectly, enter into, or in any manner take part in any business, profession or other endeavor either as an employee, agent, independent contractor, owner or otherwise which in the opinion of the President of the Employer shall be in direct competition with the business of the Employer, which opinion of the President shall be conclusive for the purposes hereof.

In Connecticut,[4] such covenants are "valid and binding" if the restraint is reasonable. <u>Scott v. General Iron & Welding Co.</u>, 171 Conn. 132, 137, 368 A.2d 111, 114-15 (1976). The courts consider five factors in evaluating the reasonableness of a covenant not to compete: "(1) the length of time the restriction operates; (2) the geographic area covered; (3) the fairness of the protection accorded to the employer; (4) the extent of the restraint on the employee's opportunity to pursue his occupation; and (5) the extent of interference with the public's interests." <u>Robert S. Weiss & Assocs., Inc. v. Wiederlight</u>, 208 Conn. 525, 529 n. 2, 546 A.2d 216, 219 n. 2 (1988).

As to the first factor, a time restriction is valid if it is reasonably limited and fairly protects the interests of both the employer and the employee. <u>Wiederlight</u>, 208 Conn. at 530-31, 546 A.2d at 220; <u>see</u> <u>also</u> <u>Scott</u>, 171 Conn. at 140, 368 A.2d at 116 (upholding a five-year covenant barring an employee from working in a competing business). Connecticut courts have repeatedly ruled that a two-year employment restriction, such as the one presented here, is reasonable. <u>See</u> <u>Gillette Co., v. Williams</u>, 360 F. Supp 1171, 1177 (D. Conn. 1973) (precluding

---

[4]    Section 6 of the Agreement states that the Agreement "shall be governed by the laws of the State of Connecticut."

work in the United States involving safety razors for two years); <u>Torrington Creamery, Inc. v.</u>
<u>Davenport</u>, 126 Conn. 515, 519, 12 A.2d 780, 783 (1940) (finding a two-year limitation
reasonable); <u>Weiderlight</u>, 208 Conn. at 531, 546 A.2d at 220 (finding a two-year time restriction
to be fair); <u>Francavilla</u>, 191 F. Supp. 2d at 281 (a two-year time limit protects the employer's
interests, as well as ensuring that the defendant can return to the same field within a definite and
reasonable time).

As to the second factor, the geographic area covered, the restrictive covenant will
be enforced if it is "confined to a geographic area which is reasonable in view of the particular
situation." <u>Scott</u>, 171 Conn. at 138, 368 A.2d at 115; <u>see</u> <u>also</u> <u>Branson Ultrasonics Corp.</u>, 921 F.
Supp. at 913 (upholding a global geographic restriction in view of the former employer's
international marketing activities). Here, Oberoi's restrictive covenant contains no geographic
limitations. However, (1) the restrictive covenant only bars Oberoi from taking part in any
business that is "in direct competition with the business of [Bridgewater];" and (2) Bridgewater
is a global investment manager that has no geographic limitations and competes for business on a
global basis.

Bridgewater's hedge fund business and Telluride compete for the same customer
base of institutional and individual clients. Indeed, Bridgewater only learned that Oberoi
planned to join a competitor when both a customer and a prospective customer of Bridgewater
advised that Telluride, a new, start-up hedge fund, had recruited a former Bridgewater employee,
Oberoi. In addition, Bridgewater manages billions of dollars for clients located in a host of
foreign countries, including the United Kingdom, the Netherlands, Norway, Italy, Canada,
Singapore, Japan, the United Arab Emirates, China and Australia. Dalio Aff. ¶ 5.

In such circumstances, it is clear that Oberoi's covenant not to compete, despite the absence of a geographic restriction, is enforceable. See KX Indus. L.P. v. Saaski, No. CV 960386806S, 1997 WL 583629, at *5 (Conn. Super. Ct. Aug. 29, 1997) (upholding a restrictive covenant that stated no specific geographic boundaries because it only prohibited defendant from working for competitors); Francavilla, 191 F. Supp. 2d at 280 (upholding a global geographic restriction because former employer marketed internationally and was only restricted from working with firms that produced the same products and services as the former employer); Industrial Technologies, Inc. v. Paumi, No. CV 960335925, 1997 WL 306723, at * 9 (Conn. Super. Ct. May 28, 1997) ("noncompete provision[s] [with] worldwide application [have] been found not to be a per se violation of public policy") (citations omitted); Newinno, Inc. v. Peregrim Dev., Inc., No. CV 0203900745, 2003 WL 21493838, at * 3 (Conn. Super. Ct. June 3, 2003) ("nondisclosure agreements lacking in geographic or time limitations" found to be enforceable) (citations omitted); Business Intelligence Servs., Inc. v. Hudson, 580 F. Supp 1068, 1072-73 (S.D.N.Y. 1984) (upholding a one-year, world-wide restriction that was limited to businesses in competition with the employer).

The third factor – fairness of the protection to the employer – is evaluated by deciding if the restrictions "appear to be reasonably necessary for the fair protection of the employer's business or rights." Wiederlight, 208 Conn. at 533, 546 A.2d at 221 (quoting May v. Young, 125 Conn. 1, 6, 2 A.2d 385, 388 (1938)). Here, Bridgewater has invested 28 years and millions of dollars worth of employee time to the development and refinement of its Investment Management Systems. Dalio Aff. ¶ 8. Those Systems are the foundation of Bridgewater's success, as reflected in the "top ten" ratings repeatedly garnished by Bridgewater in recent years. Dalio Aff. ¶ 38. Bridgewater's strict application of its Systems accounts for results that are time

and again substantially better than the industry advantage. Id. Those impressive results, in turn, are responsible for Bridgewater's ability to attract and retain customers.

The non-compete restriction in Oberoi's Agreement ensures that Bridgewater's hard-won competitive advantage will not be sabotaged by an employee who, having been tutored over the course of many years in the insights and innovation reflected in Bridgewater's Investment Management Systems, chooses to make use of that confidential and proprietary information to compete against Bridgewater.

The fourth factor is the extent of the restraint on the employee's opportunity to pursue his occupation. Here, the non-compete provision merely prevents Oberoi from working for a direct competitor of Bridgewater. These direct competitors, hedge funds such as Telluride, are only a small subset of the commercial enterprises comprising the financial services sector of the economy. Thus, Oberoi remains free to pursue numerous other career opportunities in the financial services business.

Finally, as to the fifth factor, a non-compete restriction does not interfere with the public interest when "'the employer is seeking to protect a legally recognized interest [and] . . . the means used to achieve this end do not unreasonably deprive the public of essential goods and services.'" KX Indus., 1997 WL 583629, at *7 (citing New Haven Tobacco Co. v. Perelli, 18 Conn. App. 531, 536, 559 A.2d 715, 718 (1989)). Here, the non-compete provision does not deprive the public of any essential goods or services, nor will it have "an impact on competition that could be adverse to the public's interest." Francavilla, 191 F. Supp at 281. Both Bridgewater's and Telluride's services remain available to the public. Indeed, enforcement of Oberoi's non-compete commitment can serve only to foster competition and the public interest

by confirming to the Connecticut business community that non-compete provisions remain an important tool in protecting an employer's investments in innovation.

**D.  Bridgewater Has Shown a Likelihood of Success on the Merits
of Its Claim For Breach of Oberoi's Confidentiality Agreement**

It is well-settled that confidential information or other knowledge gained by an employee during the course of his employment may not be used for the benefit of a competitor, even after that employment has ceased.  See Allen Mfg. Co. v. Loika, 145 Conn. 509, 514, 144 A.2d 306, 309 (1958) (emphasis added); see also Town and Country House and Homes Serv., Inc. v. Evans, 150 Conn. 314, 319, 189 A.2d 390, 393 (1963) (every employment contract contains a prohibition against the use of confidential information acquired during the course of his employment).  To supplement their other legal remedies, employers often require employees to sign confidentiality agreements to protect trade secrets and confidential information. See Weseley Software Dev. Corp. v. Burdette, 977 F. Supp 137, 141 (D. Conn. 1997); KX Indus., 1997 WL 583629, at *1 n. 5.

Here, Oberoi specifically promised in writing that he would not disclose any information concerning Bridgewater's business, including "the systemized investment decision making process" utilized by Bridgewater (e.g., the Investment Management Systems).  Oberoi's promise is unambiguous and binding, and must be enforced.

**E.  The Balance of the Equities Favors Granting the Injunctive Relief**

The courts have routinely held that the balance of the equities favors the former employer where, as is the case here, the former employee is likely to divulge confidential information to a competitor.  See Francavilla, 191 F. Supp. 2d at 282 (where a former employer's work is substantially similar to that of a new employer, non-compete covenants are enforceable to prevent disclosure of former employer's confidential information); KX Indus., 1997 WL

583629, at *7 (emphasizing an employer's interest in protecting itself from competition from a former employee who became familiar with a proprietary process while employed by plaintiff); Loika, 145 Conn. at 516, 144 A.2d at 309 ("[n]o restriction is placed upon the defendants by [enjoining them not to divulge the confidential information] except to the extent of requiring them to preserve inviolate what came to them in confidence").

Furthermore, Oberoi certainly cannot object about any purported unfairness, since the injunction will only hold him to the bargain he voluntarily made – to not work for a competitor for two years and to maintain Bridgewater's proprietary information as confidential. See Continental Group, Inc. v. Kinsley, 422 F. Supp. 838, 844 (1976) ("an injunction to bar competitive employment . . . is an entirely appropriate remedy because of the conscious choices both the employer and the employee made when the covenant was given"). In contrast, denial of injunctive relief will seriously and irreparably damage Bridgewater, which will lose the exclusive benefit of valuable proprietary information that it spent considerable time and expense to develop. See Branson Ultrasonics Corp., 921 F. Supp. at 914 (although "interfering with [a person's] employment . . . is a serious matter," the court upheld the non-compete provision and enjoined the employee from working for a competitor because if the confidential information were divulged to a competitor the former employer would suffer immeasurable injury). In addition, as noted above, Oberoi has many other employment options in the financial services industry. Indeed, Oberoi's willingness to relocate from Connecticut to Minnesota reveals that he can reasonably "be regarded as available for employment anywhere in the country." See Continental Group, Inc., 422 F. Supp. at 845.

## CONCLUSION

For the reasons set forth above, Bridgewater's application for a temporary restraining order and a preliminary injunction should be granted.

Respectfully submitted,

PLAINTIFF,
BRIDGEWATER ASSOCIATES, INC.

By:/s/Jonathan B. Tropp
        Jonathan B. Tropp
        Day, Berry & Howard LLP
        One Canterbury Green
        Stamford, Connecticut 06901
        (203) 977-7300
        Fax: (203) 977-7301
        jbtropp@dbh.com
        Its Attorneys

Of Counsel:
Michael M. Gordon, Esq.
CADWALADER, WICKERSHAM & TAFT LLP
100 Maiden Lane
New York, New York 10038
(212) 504-6000